Filed 2/27/14  P. v. Smith CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ERNEST EDWARD SMITH,<br><br>Defendant and Appellant. | F065229<br><br>(Super. Ct. No. F11902905)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Hilary A. Chittick, Judge.

Robert Navarro, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna, David Andrew Eldridge and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted appellant Ernest Edward Smith of two counts of assault with a firearm and possession of a firearm by a felon. Several enhancements also were found true, including that Smith personally inflicted great bodily injury on the minor victim. He challenges his convictions on multiple grounds, including (1) admission of a 911 call violated his confrontation clause rights under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and the call did not qualify for admission under the excited utterance hearsay exception; (2) the evidence established that his use of a firearm was in self-defense; and (3) the evidence was insufficient to support the great bodily injury finding.

We reject all of Smith's contentions and will affirm the judgment.

### FACTUAL AND PROCEDURAL SUMMARY

On the morning of May 16, 2011, elementary-school-age Richard was on his way to school when he was chased home by Smith's children. Richard told his mother (mother) what had happened. This had occurred before and mother was concerned, in part, because Richard had been chased across a busy street.

Smith and his family lived in the apartment across from mother. Mother went to Smith's apartment and knocked on the door, but no one answered. Mother then called her 20-something-year-old son, Timothy, and asked him to come and speak with Smith about his children's behavior. Timothy had spoken with Smith two or three times before about the behavior of Smith's children.

Before Timothy arrived, Smith came outside with his boys and spoke with mother. Present with mother were her mother (grandmother), Richard, and another son, K., who was around five years old. Smith indicated his boys knew not to do what Richard was accusing them of and he, Smith, would punish his children if they did anything wrong.

When Timothy arrived, he walked up to Smith. A verbal altercation ensued, with Timothy challenging Smith to a fight in the back alley. Mother and grandmother got in between the two men and held Timothy back. Smith walked away and entered his apartment but quickly came back outside and told Timothy he was "a bitch and your

2.

mama … a bitch." Timothy broke free from his mother and grandmother and ran toward Smith. Smith pulled out a gun and pointed it at Timothy. Timothy slowed down and held his hands up but continued to walk toward Smith. Smith shot Timothy, who fell to the ground. The bullet went through Timothy and lodged in K.'s face.

The bullet entered Timothy in the abdominal area and exited through his buttocks. The bullet caused multiple holes in Timothy's small intestine and multiple injuries to his large intestine and colon. The bullet in K.'s face was removed by a surgeon and the wound sutured. The bullet caused a hairline fracture of K.'s jaw.

Smith was charged with attempted murder (count 1), two counts of assault with a firearm (counts 2 and 3), and possession of a firearm by a felon (count 4). It also was alleged in count 1 that Smith personally and intentionally discharged a firearm, which caused great bodily injury within the meaning of Penal Code section 12022.53, subdivision (d).[1] In counts 2 and 3 it was alleged that Smith personally used a firearm and personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a). It also was alleged that Smith had served two prison terms.

Trial before a jury began on March 12, 2012. Smith's son, D., and daughter, L., testified. D. testified he saw Timothy arrive and Timothy was "real angry." Smith was telling Timothy he did not want to fight; Timothy was saying he was going to kill Smith. When Timothy started running toward Smith, Smith pulled out a gun and shot Timothy.

L. testified she witnessed the incident and heard Timothy threaten to kill Smith. When Timothy broke free of his mother and grandmother, it appeared to L. that Smith was in danger. Smith pulled out a gun, pointed it at Timothy's face, and then lowered the trajectory of the gun and fired.

---

[1]All further statutory references are to the Penal Code unless otherwise specified.

The prosecution moved to dismiss the count 1 charge at the close of its case, and the trial court granted the motion. On March 21 the jury returned verdicts of guilty on the three remaining counts and found the personal use of a firearm and great bodily injury enhancements true. The parties stipulated that Smith previously had been convicted of a felony. The trial court found the prison term allegations true.

On May 30, 2012, the trial court sentenced Smith to a total term of 12 years in prison.

## DISCUSSION

### I. Admission of the 911 Call

Smith raises several issues about the trial court's decision to admit the tape recording of Jamie Stanfield's call to the 911 operator. Smith argues Stanfield's statements were inadmissible testimonial evidence under the Sixth Amendment and *Crawford*. In the alternative, he argues that even if Stanfield's statements were not testimonial, her statements were not admissible under the spontaneous declaration exception to the hearsay rule, also known as excited utterance, because there no longer was an emergency when Stanfield called 911.

#### *Crawford and 911 Calls*

Smith contends Stanfield's statements to the 911 operator were testimonial and inadmissible pursuant to the Sixth Amendment and *Crawford* because Stanfield did not testify at trial and she was not subject to cross-examination. In *Crawford*, the United States Supreme Court held the Sixth Amendment bars the admission of out-of-court testimonial statements except when both the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. (*Crawford, supra*, 541 U.S. at pp. 59, 68.) *Crawford* did not set forth "a comprehensive definition" of testimonial evidence but held that "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (*Id.* at p. 68.) *Crawford* held that where the proffered statement is

4.

nontestimonial, state law may regulate the admission of evidence by applying statutory hearsay rules without running afoul of the confrontation clause. (*Ibid.*)

In *Davis v. Washington* (2006) 547 U.S. 813 (*Davis*), the United States Supreme Court determined "when statements made to law enforcement personnel during a 911 call or at a crime scene are 'testimonial' and thus subject to the requirements of the Sixth Amendment's Confrontation Clause." (*Id.* at p. 817.) *Davis* addressed two cases with different factual situations. In one case, a domestic disturbance victim called 911 and described the perpetrator's actions to the operator as she was being assaulted. In response to the operator's specific questions, the victim reported the perpetrator's name, described how he was attacking her, and identified her location. The victim started to ramble and the 911 operator admonished her to "'Stop talking and answer my questions.'" (*Id.* at pp. 817-818.) As the call progressed, the victim said the perpetrator had just run out the door and was leaving in a car. At trial, the victim did not appear and the prosecution introduced the tape recording of the 911 call. (*Id.* at pp. 818-819.)

*Davis* also addressed the facts of a companion case in which officers arrived at the home of a domestic violence victim shortly after she had been assaulted. The perpetrator was still at the house and tried to interfere as the victim spoke to the officers. The officers interviewed the victim separately about the incident, and she signed a written battery affidavit about how the perpetrator attacked her. The victim refused to appear at trial, and the prosecution introduced the testimony of the officers who interviewed her. (*Davis, supra,* 547 U.S. at pp. 819-821.)

*Davis* offered the following definition of testimonial statements under *Crawford* and the Sixth Amendment:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the

primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis, supra*, 547 U.S. at p. 822.)

*Davis* relied on this definition and held that in the first case the victim's statements to the 911 operator were admissible and not testimonial under *Crawford*. The court held that the initial interrogation conducted in connection with a 911 call "is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." (*Davis, supra*, 547 U.S. at p. 827.) The victim who called 911 was "speaking about events *as they were actually happening,* rather than 'describ[ing] past events,' [citation]." (*Ibid.*) The victim "was facing an ongoing emergency," and her 911 call "was plainly a call for help against a bona fide physical threat." (*Ibid.*) Moreover, the questions posed by the 911 operator did not turn the victim's statements into testimonial evidence because "the nature of what was asked and answered … again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn … what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. [Citation.]" (*Ibid.*) The victim's "frantic answers" were provided "in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." (*Ibid.*)

*Davis* thus concluded the circumstances of the 911 operator's "interrogation" of the victim "objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. [The victim] simply was not acting as a *witness*; she was not *testifying*. What she said was not 'a weaker substitute for live testimony' at trial .… No 'witness' goes into court to proclaim an emergency and seek help." (*Davis, supra*, 547 U.S. at p. 828.)

*Davis* also held, however, that once the 911 operator "gained the information needed to address the exigency of the moment, the emergency appears to have ended

(when [the perpetrator] drove away from the premises)." (*Davis, supra*, 547 U.S. at p. 828.) At that point, the victim's statements were testimonial and the 911 operator's questions were "not unlike the 'structured police questioning'" that was found testimonial in *Crawford*. (*Davis,* at pp. 828-829.)

In contrast, *Davis* held the victim's statements to the police officers in the companion case were testimonial and inadmissible in the absence of the victim's trial testimony. The victim told the officers that things were fine. Her statements were given through a written affidavit, as part of an investigation into possible past criminal conduct, and there was no emergency or immediate threat to the victim. (*Davis, supra*, 547 U.S. at pp. 827, 819-821, 829-830.) The officers did not ask questions to determine "'what [was] happening,' but rather 'what happened.' Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer *should* have done." (*Id.* at p. 830.)

A series of California cases have found that a declarant's statements to a 911 operator are not testimonial under *Crawford*. In *People v. Corella* (2004) 122 Cal.App.4th 461 (*Corella*), the defendant's wife called 911 and reported to the operator that the defendant had hit her and repeated the accusation to a police officer and medical personnel who responded to the call. At the preliminary hearing, the defendant's wife claimed her prior accusations were false, and she refused to testify at trial. The trial court found the wife's initial statements to the 911 operator were not testimonial under *Crawford* and admitted her statements as spontaneous declarations. (*Corella,* at pp. 464-465.)

*Corella*, which was decided prior to *Davis*, anticipated much of the United States Supreme Court's reasoning in that case and held the wife's statements to the 911 operator were not testimonial under *Crawford*. *Corella* noted the wife's statements were not "'knowingly given in response to structured police questioning,' and bear no indicia common to the official and formal quality of the various statements deemed testimonial

7.

by *Crawford.* [Defendant's wife], not the police, initiated the 911 call to request assistance. . . . Not only is a victim making a 911 call in need of assistance, but the 911 operator is determining the appropriate response. The operator is not conducting a police interrogation in contemplation of a future prosecution." (*Corella, supra*, 122 Cal.App.4th at p. 468.)

In *People v. Brenn* (2007) 152 Cal.App.4th 166 (*Brenn*), the defendant and the victim lived at a group home and got into a fight over the defendant's girlfriend. The defendant grabbed a knife and stabbed the victim in the stomach. The victim left the group home, went to another location, called 911, and reported the stabbing. The 911 operator asked the victim who had stabbed him and how it had happened. The victim identified the defendant, explained they were fighting about the defendant's girlfriend, and described the fight in detail. The operator asked the victim several questions about the defendant's location, whether the defendant had mental health problems, and if he still had a knife. The victim answered to the best of his knowledge. (*Id.* at pp. 170-171.)

*Brenn* held the victim's statements to the 911 operator were not testimonial under *Crawford* and *Davis* because "the purpose and form of the statements were not the functional equivalents of trial testimony." (*Brenn, supra*, 152 Cal.App.4th at p. 176.) *Brenn* further held there was no material difference between the victim's statements to the 911 operator about the stabbing and the 911 call in *Davis*. (*Brenn,* at p. 177.) *Brenn* held the victim's statements about the stabbing were made "in response to rapid-fire questioning from the dispatcher. There was nothing formal, solemn or structured about the colloquy. And unlike a criminal prosecutor, the dispatcher was primarily concerned with what was happening at the moment, as opposed to what had happened in the past. The dispatcher was eliciting information in an attempt to assess the present situation and help [the victim] and the responding officers, not secure a conviction in a court of law." (*Id.* at pp. 176-177.) *Brenn* discounted the fact that the victim told the 911 operator he wanted to press charges against the defendant: "[I]t does not appear that his *primary*

8.

*purpose* during the call was to establish past facts for use in a criminal trial, or that the 911 operator was concerned about that issue.… '[T]he proper focus is not on the mere reasonable chance that an out-of-court statement might later be used in a criminal trial. Instead, we are concerned with statements, made with some formality, which, *viewed objectively*, are for the *primary purpose* of establishing or proving facts for possible use in a criminal trial.' [Citation.]" (*Id.* at p. 177.)

*Brenn* also rejected the defendant's argument that the victim no longer was facing an emergency as he spoke to the 911 operator about the stabbing and noted such a claim was "much easier to make from a law office than from 100 feet from someone who has just stabbed you." (*Brenn, supra*, 152 Cal.App.4th at p. 177.) The victim was suffering a stab wound and defendant was still at large. "It is hard to construct a definition of the word 'emergency' that this scenario does not fit." (*Ibid.*) The victim's information was important to help the police "formulate an appropriate response to the situation. It does not appear the information was elicited or provided for the primary purpose of making a case against [defendant] at trial." (*Ibid.*)

In *People v. Banos* (2009) 178 Cal.App.4th 483 (*Banos*), the court addressed the admissibility of several out-of-court statements made by a domestic violence victim who later was murdered by the defendant.

In March 2004, the victim called 911 and, in response to the dispatcher's questions, identified herself and said she had a restraining order against the defendant and that he was at her apartment and she was afraid he was going to attack her. The victim explained she was calling from a phone booth because he was dangerous, he had been arrested a few months earlier for attempted murder, and he was not supposed to be near her. (*Banos, supra,* 178 Cal.App.4th at pp. 488, 492.)

*Banos* held the victim's statements to the 911 operator in March 2004 were not testimonial under *Davis* and *Crawford*. (*Banos, supra*, 178 Cal.App.4th at pp. 492-493, 497.) The victim's "primary purpose for making the statements to the 911 dispatch

officer was to gain police protection. The statements were not yet the product of an interrogation, rather, they were made to police conducting an investigation into an ongoing emergency." (*Id.* at p. 497; see also *People v. Byron* (2009) 170 Cal.App.4th 657, 661-662, 675 [victim's statements about defendant's assault on her, in response to questions posed by 911 operator, were not testimonial under *Davis* and *Crawford*].)

Here, as in *Davis* and the California cases, Stanfield's statements to the 911 operator were not testimonial under *Crawford*; the trial court properly admitted her statements even though she did not testify and was not subject to cross-examination; and Smith's Sixth Amendment rights were not violated.

Stanfield began the call by yelling, "HEY! HEY! HEY!" and telling the 911 operator her neighbor had just shot someone and the neighbor was still inside his apartment. She followed up with the comment, "they need to get the police out here right now" because the neighbor was still inside his apartment. Stanfield stated she had been watching what had happened and that her neighbor shot someone and then went back inside his apartment. As Stanfield was talking to the 911 operator, she stated the neighbor's wife had "just left out'a here with the gun" and returned without the gun. The wife left in a truck and came back on foot; Stanfield described the truck. Stanfield conveyed a description of the truck used by the wife and the fact the wife's mother lived nearby. Stanfield stayed on the phone with the 911 operator until after police arrived, telling the 911 operator, "I see all the police." Stanfield then stated, "I don't know if [the police officer] wants to talk to me but I, I witnessed it and I seen what he did." The 911 operator then took Stanfield's name, phone number, and address, and told her the contact information would be conveyed to the police so officers could "talk to [her]" about the incident.

Stanfield started her 911 call with a plea for police assistance and conveyed what was happening at the present moment to the 911 operator until police officers arrived. Stanfield's "primary purpose for making the statements to the 911 dispatch officer was to

10.

gain police protection. The statements were not yet the product of an interrogation, rather they were made to police conducting an investigation into an ongoing emergency." (*Banos, supra*, 178 Cal.App.4th at p. 497.) Events were still transpiring—such as the attempt to dispose of the gun—while Stanfield was on the line to the 911 operator. Although Stanfield rambled about unrelated matters, it is clear she was caught up in the excitement of the moment and the unrelated matters were redacted from the 911 transcript provided to the jury.

Smith apparently asserts that since *Davis* was decided, answers to questions from an agent of the police that are designed to determine facts about a crime that has been committed, and not to address an ongoing emergency, are testimonial and may violate the confrontation clause where the declarant is unavailable for cross-examination. Smith insists the incident concluded with the shot itself and police were on the scene at the start of Stanfield's 911 call; thus, there was no ongoing emergency. This is factually incorrect.

The transcript of the 911 call demonstrates that police did not arrive until *after* Stanfield made the 911 call—hence her initial plea to "get the police out here right now." The discussion with the 911 operator ended after police arrived on the scene and the operator had Stanfield's contact information. Furthermore, Smith's factual assertion that the incident ended with the shooting is incorrect. The incident was ongoing at a minimum during the time Smith's wife attempted to dispose of the gun used in the shooting. Smith was not even placed under arrest until four days after the shooting.

In addition, *Davis* did not undermine *Corella's* analysis of the *Crawford* issue and held that a 911 call "is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." (*Davis, supra*, 547 U.S. at p. 827.) *Davis* held the victim's call in that case "was plainly a call for help against a bona fide physical threat." (*Ibid*.) Moreover, the questions posed by the 911 operator in *Davis* did not turn the victim's statements into testimonial evidence

11.

because "the nature of what was asked and answered … again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn … what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. [Citation.]" (*Ibid*.)

Stanfield's 911 call was not testimonial because she "was not acting as a *witness*; she was not *testifying*. What she said was not 'a weaker substitute for live testimony' at trial .… No 'witness' goes into court to proclaim an emergency and seek help." (*Davis*, *supra*, 547 U.S. at p. 828.) We thus conclude Stanfield's statements to the 911 operator were not testimonial and Smith's Sixth Amendment rights were not violated by the introduction of the evidence in the absence of his ability to cross-examine Stanfield.

### Excited Utterance

Smith next contends that even if Stanfield's call to the 911 operator was not testimonial, the trial court erroneously admitted the redacted transcript of the call into evidence under the excited utterance or spontaneous declaration exception to the hearsay rule. Smith argues there was no ongoing emergency and thus no spontaneous statements in response to the emergency. Further, he contends there was no credible evidence the prosecutor exercised due diligence in trying to locate Stanfield.

We first note that Smith has forfeited this issue. Although he objected in the trial court to the admissibility of Stanfield's 911 call on the grounds it was testimonial and admission would violate *Crawford,* Smith never interposed an objection on the grounds the call did not qualify as a spontaneous statement exception to the hearsay rule. By failing to do so, Smith has forfeited the issue on appeal. (Evid. Code, § 353, subd. (a); *People v. Crew* (2003) 31 Cal.4th 822, 845.) Regardless, we briefly address the contention on its merits.

12.

Even if an out-of-court statement is not testimonial under *Crawford*, the statement still must be admissible under applicable state evidentiary rules, including hearsay rules. (*Crawford*, *supra*, 541 U.S. at p. 68; *People v. Cervantes* (2004) 118 Cal.App.4th 162, 173; *Banos*, *supra*, 178 Cal.App.4th at p. 494, fn. 3.)  Evidence Code section 1240 states the excited utterance or spontaneous declaration exception to the hearsay rule:

> "Evidence of a statement is not made inadmissible by the hearsay rule if the statement:  [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

> "The hearsay exception for spontaneous declarations is among those 'firmly rooted' exceptions that carry sufficient indicia of reliability to satisfy the Sixth Amendment's confrontation clause.  [Citation.]"  (*People v. Dennis* (1998) 17 Cal.4th 468, 529; see also *People v. Rincon* (2005) 129 Cal.App.4th 738, 756-757.)

The trial court's determination of the preliminary facts, such as whether the declarant was under the stress of excitement when the statements were made, will be upheld if supported by substantial evidence.  (*People v. Phillips* (2000) 22 Cal.4th 226, 235-236 (*Phillips*); *People v. Brown* (2003) 31 Cal.4th 518, 540-541.)  The court's ultimate decision to admit the evidence is reviewed for an abuse of discretion.  (*Phillips*, at p. 236.)

Smith's challenge to the trial court's exercise of discretion is similarly unconvincing as is his challenge to its admissibility under *Crawford*.  *People v. Gutierrez* (2000) 78 Cal.App.4th 170 explains the requirements that must be met in order for the excited utterance exception to apply to hearsay evidence, such as the contents of a 911 call.  First, there must have been an occurrence startling enough to produce nervous excitement and unreflecting statements.  Second, the statements must have been made before there was time to contrive and misrepresent.  Finally, the statements must have related to the circumstances of the occurrence that preceded them.  (*Id*. at p. 177; see also

*People v. Farmer* (1989) 47 Cal.3d 888, 901 (*Farmer*).)  The decision whether to admit hearsay evidence under this exception falls within the trial court's broad grant of judicial discretion.  (*People v. Hines* (1997) 15 Cal.4th 997, 1034-1035, fn. 4.)

Smith does not cite any case overturning admission of a 911 call as an abuse of discretion.  On the contrary, numerous cases have upheld admission of 911 calls as falling within the parameter of the excited utterance exception.  *Corella* concluded that the 911 call at issue satisfied the requirements of section 1240.  (*Corella, supra*, 122 Cal.App.4th at pp. 466-467.)  Earlier, in *People v. Roybal* (1998) 19 Cal.4th 481, 516, the California Supreme Court upheld admission of a 911 call placed by the victim's husband and in *Farmer, supra*, 47 Cal.3d at pages 903 through 905 it upheld admission of a 911 call placed by the victim and statements the victim made to a responding police officer.

Here, Stanfield was prompted to call 911 by the startling occurrence of having seen her neighbor shoot an unarmed man.  Her statements were made roughly contemporaneous with events that were unfolding, not later when she would have had an opportunity to reflect or contrive, and only those statements that pertained to the incident were admitted into evidence.  Under these facts, we conclude the trial court did not abuse its discretion in admitting the redacted 911 call pursuant to Evidence Code section 1240.  (*Phillips*, *supra*, 22 Cal.4th at p. 236.)

## II.     Sufficiency of the Evidence

### *Self-defense Claim*

Smith contends the evidence was insufficient to support the convictions because the evidence established Smith acted in self-defense.  We disagree.

Whether Smith's actions constituted an act of self-defense or the unnecessary use of force is a factual question.  Therefore, the appropriate standard of review is sufficiency of the evidence.  (*People v. Colbert* (1970) 6 Cal.App.3d 79, 85.)

The crux of Smith's argument is that he acted in self-defense during a sudden quarrel in the honest and mistaken belief that a resort to deadly force was necessary to

avert a threat of death or great bodily injury at the hands of Timothy, the initial aggressor and provocateur. Yet substantial evidence supports the jury's findings to the contrary. Even if we might have "drawn different inferences, we are not permitted to reverse the judgment if the circumstances reasonably justify those found by the jury." (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.)

The evidence established that Timothy walked up to Smith and started a verbal altercation; Timothy also challenged Smith to a fight. Timothy's mother and grandmother then interceded and held Timothy back; Smith walked away and entered his apartment. Instead of remaining in his apartment, Smith came back outside, with a gun, and taunted Timothy. When Timothy broke free of the women restraining him, he advanced toward Smith. Timothy had nothing in his hands and was unarmed. Smith shot Timothy.

Smith's insufficiency of the evidence argument simply asks us to reweigh the facts. That we cannot do. (*People v. Bolin* (1998) 18 Cal.4th 297, 331-333.) On these facts, even if construed to favor Smith, we simply cannot conclude as a matter of law that Smith acted in self-defense. Smith had walked away from the altercation and had entered his apartment, but he chose to return and escalate the incident by bringing with him a gun and taunting Timothy. Once Smith returned from a place of safety, escalated the violence by bringing a gun, taunted Timothy, and then shot Timothy when he reacted to the taunting, Smith's actions wholly ceased to be in self-defense. At this point, Smith had become the aggressor.

Moreover, even if acting in self-defense, Smith was entitled to use only that force that was reasonable under the circumstances. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065.) The use of excessive force negates any claim of self-defense. (*People v. Hardin* (2000) 85 Cal.App.4th 625, 629-630.) Smith's use of a deadly weapon against an unarmed man was not, as the jury concluded, reasonable under the circumstances.

15.

*Great Bodily Injury*

Smith claims the injuries suffered by K. were not sufficiently "great" so as to constitute great bodily injury within the meaning of section 12022.7. He is incorrect.

Section 12022.7, subdivision (f) defines "great bodily injury," for purposes of the enhancement, as "a significant or substantial physical injury." In order to constitute great bodily injury for the enhancement, there is no requirement that "the victim suffer 'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of bodily function." (*People v. Escobar* (1992) 3 Cal.4th 740, 750 (*Escobar*).) "[S]ignificant or substantial [means] not insignificant, trivial or moderate. [Citation.]" (*People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066.) "Abrasions, lacerations, and bruising can constitute great bodily injury. [Citation.]" (*People v. Jung* (1999) 71 Cal.App.4th 1036, 1042.)

The determination of whether a victim has suffered physical harm amounting to great bodily injury is not a question of law for the court but a factual inquiry to be resolved by the jury. (*People v. Cross* (2008) 45 Cal.4th 58, 64.) ""If there is sufficient evidence to sustain the jury's finding of great bodily injury, we are bound to accept it, even though the circumstances might reasonably be reconciled with a contrary finding."' [Citations.]" (*Escobar, supra*, 3 Cal.4th at p. 750.) ""A fine line can divide an injury from being significant or substantial from an injury that does not quite meet the description."' [Citations.] Where to draw that line is for the jury to decide." (*Cross,* at p. 64.)

We conclude there was substantial evidence here to support the jury's finding of great bodily injury. A bullet entered K.'s face, lodging near the jawbone. The bullet caused a hairline fracture of the jaw. After removing the bullet, the surgeon closed the wound with sutures and prescribed pain medication. K.'s mother testified the boy was on prescription pain medication for about three months and had partial paralysis of the face for about three months. As of the time of trial, K. sometimes "could just be sitting up

16.

talking … and he just starts bleeding." This evidence was sufficient to permit the jury to conclude that Smith had inflicted significant or substantial physical injury on K.

## DISPOSITION

The judgment is affirmed.

_____

CORNELL, J.

WE CONCUR:


_____

HILL, P.J.


_____

LEVY, J.